# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 6, 2011

## TONY L. PIRTLE v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Hardeman County**
**No. 6092     J. Weber McCraw, Judge**

---

**No. W2011-00925-CCA-R3-PC  - Filed October 4, 2012**

---

The petitioner, Tony L. Pirtle, pled guilty to aggravated burglary, aggravated kidnapping, and facilitation of aggravated rape. The petitioner received an effective sentence of thirty years in the Tennessee Department of Correction. Thereafter, the petitioner filed a motion for post-conviction DNA testing, alleging that testing would exonerate his co-defendant and, thereby, exonerate the petitioner. The court denied the motion, and the petitioner appeals. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

William D. Massey and Lorna S. McClusky (on appeal), and Lauren Massey-Fuchs (at trial) Memphis, Tennessee, and Craig M. Cooley (at trial and on appeal) and Peter J. Neufeld (on appeal), New York, New York, for the appellant, Tony L. Pirtle.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffery D. Zentner, Assistant Attorney General; D. Michael Dunavant, District Attorney General, and Joe L. Van Dyke, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The petitioner's convictions arose as the result of a burglary, kidnapping, and rape that occurred in Hardeman County. The record before us does not contain a transcript of the petitioner's guilty plea hearing. However, from the record we glean that on February 28, 1997, the Hardeman County Sheriff's Department contacted Officer Steve Cox regarding a

possible kidnapping and car theft. Around 12:12 a.m., Officer Cox went to the residence of the victim, T.L.[1] The victim was not there; she was at a residence on Union Springs Road. However, Officer Cox spoke with the victim's sister, who told Officer Cox that someone "jumped" the victim at her house, stole her car, and drove her to the intersection of Union Springs Road and Murphy Lane where she was "dumped . . . in a dumpster." When Officer Cox went into the victim's house, he saw that it had been ransacked and that a bedroom window had been broken from the outside.

Deputy Sergeant Grove and Whiteville Police Chief Henson went to the residence on Union Springs Road to speak with the victim. Thereafter, the victim was taken to the emergency room of Bolivar General Hospital where Dr. Freeman performed a rape kit.

Subsequently, Deputy Sergeant Grove and Chief Henson found the victim's vehicle abandoned on Murphy Lane. The vehicle was taken to and secured in a garage at 125 Auto Sales on Highway 125 South in Bolivar. A Tennessee Bureau of Investigation (TBI) forensic services unit collected evidence from the vehicle.

TBI Special Agent McLean interviewed the victim at the Whiteville Police Department. The victim stated that around 8:00 p.m. on February 27, 1997, she arrived home and was assaulted by two black men. The men bound her hands and feet with duct tape, placed gauze in her mouth, and covered her mouth with tape. They put her in the trunk of her car and drove around for two or three hours. At one point, the men stopped on a rough road, got the victim out of the trunk, and ripped off her clothes. One of the men raped her twice. The men kept the victim in the back seat of the car until they arrived at the intersection of Union Springs Road and Murphy Lane where they made her get into a dumpster. The victim ultimately managed to get out of the dumpster, went to a residence on Union Springs Road, and called 911.

During the investigation, Kenneth Brown informed police that his brother, Quinswaylo Brown,[2] had information regarding the crimes and that Quinswaylo was in the Shiloh Residential Treatment Facility in Newbern. Chief Hanson and Special Agent McLean went to the facility, and Quinswaylo told them that the petitioner and Adrian Morton tried unsuccessfully to get Quinswaylo to help them rob the victim. Later, the petitioner told Quinswaylo that the petitioner broke a window of the victim's house with the butt of his shotgun and that he and Morton went into the house. When the victim came home, Morton

---

[1] It is the policy of this court to refer to the victims of sexual crimes by their initials.

[2] Some of the individuals in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

secured her with tape, and the men put her in the trunk of her car. Morton eventually put the victim in the back seat and raped her while the petitioner drove the car. Afterward, the men put the victim in a dumpster on Murphy Lane. Following the crimes, the petitioner and Morton showed Quinswaylo items they took from the victim and from her home.

After the petitioner was picked up for questioning, he gave a statement to police in which he explained that he knew the victim because he went to school with her daughter. The petitioner said that Morton came to his home and talked with him about robbing the victim. Despite his doubts, the petitioner "went along with it." The petitioner said that he and Morton walked from his house to the victim's house. The petitioner broke the back window of the house with the butt of his shotgun. The men went inside and began looking through drawers.

The petitioner said that when the victim came home, Morton "jumped her" and bound her with duct tape the men had brought with them. They put the victim in the trunk, and Morton drove the car away from the house, toward Memphis. Morton stopped on a gravel road, took the victim from the trunk, and put her in the back seat. The petitioner drove the car while Morton raped the victim. The petitioner denied that he ever raped the victim. He said that the victim stayed in the back seat until Morton ordered her to get into a dumpster.

Morton gave a statement to police, denying any involvement in the crime.

The record reflects that a cigarette butt, a beverage straw, vehicle seat cuttings, and vaginal swabs were submitted to the TBI for DNA testing. Additionally, samples were submitted from the victim, the petitioner, and Morton. The TBI report reflects that the DNA profile on the cigarette butt was "not consistent with any of the blood standards submitted." The DNA on the straw was consistent with the victim. Additionally, the TBI detected the victim's DNA on the vehicle seat cutting and the vaginal swabs. However, "[n]o determination [could] be made as to the sperm contributor(s)."

On October 12, 1998, the petitioner and Morton pled guilty to aggravated burglary and aggravated kidnapping. The petitioner also pled guilty to facilitation of aggravated rape, and Morton pled guilty to aggravated rape.

On March 4, 2010, the petitioner submitted a "Motion for Post-Conviction DNA Testing Pursuant to Tenn. Code Ann. § 40-30-301 et seq." In the motion, the petitioner contended that the TBI subjected vehicle seat cuttings and vaginal swabs "to second generation DNA testing (DQ-Alpha), but due to its limited discriminatory potential, the DQ-Alpha results only revealed [the victim's] DNA profile; [the victim's] vaginal secretions presumably masked (or overwhelmed) the perpetrator's biological fluid." The petitioner

contended that the vehicle seat cuttings and vaginal swabs

> can now be subjected to modern DNA tests that are far more
> sensitive and discriminatory than DQ-Alpha testing; if modern
> DNA tests prove that Morton ( and [the petitioner]) did not rape
> [the victim], this would undermine confidence in [the
> petitioner's] confession, prosecution, and convictions as well as
> Morton's prosecution and convictions.

On April 1, 2011, the trial court held a hearing on the motion. At the hearing, defense counsel stated that he contacted the Whiteville Police Department regarding the items tested. Counsel was informed that the department did not possess any of the biological evidence tested in this case and that the TBI "most likely has it." Defense counsel stated, however, that the TBI was uncooperative and refused to reveal whether the evidence still existed without a court order or the consent of the prosecutor. Counsel stated that the prosecutor would not give his consent.

Defense counsel maintained that Morton had given the defense a DNA sample for the purpose of new testing. Defense counsel asserted that if male DNA were found on the cuttings and swabs that did not match Morton, it would exculpate the petitioner. Defense counsel explained, "If you exonerate Adrian Morton in this case, it knocks out the factual basis of [the petitioner's] confession and his guilty plea."

The State argued that the petitioner's conviction was based upon his confession and statements of other individuals to whom the petitioner had confided his involvement. Therefore, the State contended that the petitioner knowingly and voluntarily pled guilty and that the motion was "a fishing expedition."

After the hearing, the trial court denied the petitioner's motion, finding that the petitioner

> entered a plea of guilty to the charges, that there was a statement
> given by [the petitioner] that includes an admission of guilt and
> that there were corroborating statements by others which support
> the plea of [the petitioner] and his statements. Further, the
> requests of the sampling by [the petitioner], even if it were
> found to belong to an unknown third party, would not prove
> exculpatory given the overwhelming evidence presented by [the
> petitioner's] statement and his plea of guilty.

-4-

On appeal, the petitioner challenges the trial court's denial of his motion.

## II. Analysis

The Post-Conviction DNA Analysis Act of 2001 provides that

> a person convicted of and sentenced for the commission of first degree murder, second degree murder, aggravated rape, rape, aggravated sexual battery or rape of a child, the attempted commission of any of these offenses, any lesser included offense of these offenses, or, at the direction of the trial judge, any other offense, may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

Tenn. Code Ann. § 40-30-303. A post-conviction court is obligated to order DNA analysis when the petitioner has met each of the following four conditions:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
>
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-304. Additionally, if DNA analysis would have produced a more favorable verdict or sentence if the results had been available at the proceedings leading up to the conviction or sentence, then the post-conviction court may order DNA analysis when

the petitioner meets the conditions of Tennessee Code Annotated section 40-30-305. See Griffin v. State, 182 S.W.3d 795, 798 (Tenn. 2006).

In the instant case, the trial court focused on the first requirement, whether a reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis. The post-conviction court found that the petitioner

> entered a plea of guilty to the charges, that there was a statement given by [the petitioner] that includes an admission of guilt and that there were corroborating statements by others which support the plea of [the petitioner] and his statements. Further, the requests of the sampling by [the petitioner], even if it were found to belong to an unknown third party, would not prove exculpatory given the overwhelming evidence presented by [the petitioner's] statement and his plea of guilty.

On appeal, the petitioner maintains that the trial court "failed to assume that DNA testing would produce exculpatory result[s] . . . [and] failed to assess how the exculpatory results would have *impacted* the State's decision to prosecute, [the petitioner's] decision to plead guilty, and the trial court's decision and authority to accept [the petitioner's] guilty plea." The petitioner asserts that the trial court must presume that DNA testing will produce an exculpatory result, i.e., that it "will ultimately hit to a known or unknown offender" other than Morton. The petitioner maintains that in the event of such results, the State likely would not have prosecuted the petitioner, the petitioner would likely have not pled guilty, and a jury would have likely not convicted the petitioner had the case gone to trial. Further, the petitioner contends that "[t]his would be especially true if the offender – who the DNA hit to – ultimately confessed, implicating him and another person in [the victim's] kidnapping and rape." The petitioner maintains that

> he is entitled to DNA testing under the DNA Analysis Act because he identified a theory of innocence that is "realistically possible," . . . *i.e.*, a database hit to a known offender who has no connection to [the petitioner] and/or who subsequently implicates himself as well as another person in [the victim's] assault, and the State failed to explain how it could ethically and legally prosecute [the petitioner], and Adrian Morton for the matter, if DNA testing implicated a known sex offender who, when confronted with the incriminating DNA evidence, implicated himself as well as another person in [the victim's]

assault.

The petitioner contends that the sole factual basis for his guilty pleas stems from his confession; therefore, he asserts, if the DNA results exonerate Morton, the accuracy of the petitioner's confession is called into question.

We note that our supreme court has stated that "determining whether a petitioner should be afforded DNA testing involves some conjecture, as 'it is difficult to anticipate what results DNA testing may produce in advance of actual testing.'" State v. Powers, 343 S.W.3d 36, 55 (Tenn. 2011) (quoting State v. Peterson, 836 A.2d 821, 827 (N.J. Super. Ct. App. Div. 2003)). However, courts are to "begin with the proposition that DNA analysis will prove to be exculpatory." Id. To this end, courts "'should postulate whatever realistically possible test results would be most favorable to [the] defendant in determining whether he has established' the reasonable probability requirement under that jurisdiction's DNA testing statute." Id. (quoting Peterson, 836 A.2d at 827).

Although Powers provides that courts may engage in some conjecture in envisioning whatever realistically possible *test results* would be most favorable to the petitioner, Powers does not mandate that courts should, or even may, go an extra step and postulate whatever *factual scenario* would be most favorable. This court has previously cautioned that "'[t]he statute does not authorize the trial court to order the victim to submit new DNA samples years after the offense nor does the statute open the door to any other comparisons the petitioner may envision.'" Anthony Darrell Hines v. State, No. M2006-02447-CCA-R3-PC, 2008 WL 271941, at *5 (Tenn. Crim. App. at Nashville, Jan. 29, 2008) (quoting Earl David Crawford v. State, No. E2002-02334-CCA-R3-PC, 2003 WL 21782328, at *3 (Tenn. Crim. App. at Knoxville, Aug. 4, 2003)).

However, in its order, the post-conviction court clearly proceeded under the presumption that the DNA results would be favorable. Regardless, the court found that, given the other evidence against the petitioner, the State would have nevertheless prosecuted and convicted the petitioner. We agree. Quinswaylo Brown told police that the petitioner had disclosed to him the details of the crime. The petitioner later gave a detailed confession to the crime, which was consistent the statement given by Quinswaylo. Further, the statements of the victim were consistent with those provided by the petitioner and by Quinswaylo to the police.

Moreover, as the State notes in its brief, the petitioner's confession would not be called completely into question if DNA testing should reveal the DNA of someone other than Morton. As the State notes, "The petitioner's guilty plea was not premised upon the fact that Mr. Morton raped [the victim] while the petitioner drove – it was premised upon the fact that

*someone* raped [the victim] while the petitioner drove." In other words, the petitioner could still be found culpable in the offense even if his "partner-in-crime" were proven to be someone other than Morton.

Therefore, we, like the post-conviction court, conclude that the petitioner failed to demonstrate the criteria required for DNA testing under Tennessee Code Annotated section 40-30-304.

### III. Conclusion

In sum, we conclude that the post-conviction court did not err in denying the petitioner's motion for post-conviction DNA testing.

_____
NORMA McGEE OGLE, JUDGE